IN THE CIRCUIT COURT OF THE
FOURTH JUDICIAL CIRCUIT, IN AND
FOR DUVAL COUNTY, FLORIDA

CASE NO: 16-2011-CA-002980

DIVISION: CV-E

PTA-FLA, Inc., a Florida corporation,

Plaintiff,

3:11-cv-510-J-32JRK

v.

ZTE USA, Inc., a New Jersey corporation,

Defendant.

---

## AMENDED COMPLAINT

Plaintiff, PTA-FLA, Inc. ("PTA-FLA"), a Florida corporation, sues Defendant, ZTE USA, Inc. ("ZTE"), a New Jersey corporation, and in support thereof alleges as follows:

### Jurisdiction and Parties

1. This is an action for damages greater than $15,000.00 exclusive of attorneys' fees and costs.

2. PTA-FLA is a Florida corporation with its principal place of business in Columbia, South Carolina.

3. ZTE USA, Inc. is a New Jersey corporation, registered to do business in Florida, and has transacted business in Duval County, Florida at all times material to this Complaint.

## General Allegations

4. ZTE is a manufacturer and supplier of telecommunications equipment, hardware, related software licenses, and related support services.

5. On or about July 1, 2006, ZTE and PTA-FLA began discussions regarding the purchase of telecommunications products from ZTE by PTA-FLA.

6. PTA-FLA intended to establish a fully functioning cellular telephone network in the Jacksonville, Florida area to be marketed to consumers.

7. ZTE was new to the United States cellular market and had no equipment in operation here.

8. Because PTA-FLA was concerned regarding the functionality and compatibility of ZTE's products with existing U.S. networks and hardware, PTA-FLA requested specific representations from ZTE concerning the functionality and compatibility of its products with PTA-FLA's U.S. Network.

9. During their discussions, ZTE unequivocally represented to PTA-FLA that ZTE's products would be fully functional and compatible with all U.S. standards and equipment and that ZTE personnel would be able to install and service ZTE products in the U.S.

10. In addition to general representations about the functionality and compatibility of its products and services, ZTE represented to PTA-FLA that ZTE's products would allow for the use of Multimedia Messaging Service ("MMS" or picture mail), internet access, Local Number Portability ("LNP"), CALEA (Communications Assistance to Law Enforcement Agencies), E911 (wireless 911 calling and location identification) and other standard features expected by cellular users. These representations were made by Neil Kushner, ZTE's Director of Sales and Alliances to representatives of PTA-FLA during the discussions leading up to the sale of these

products in 2006. The representations were also confirmed by Mr. Jack Yang, ZTE's General manager for U.S. operations at that time.

11. On or about September 21, 2006, ZTE and PTA-FLA entered into a Master Supply Agreement for the purchase of telecommunications products and related services for use in the Jacksonville, Florida area (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A."

12. The Agreement provided for the initial sale, installation, and commissioning of specified ZTE products to PTA-FLA with a delivery date of on or around October 2006 in Jacksonville, Florida (the "Products"). The price for the Products was $3,800,000.

13. On an extended basis ending on or around May 2007 (and far exceeding the required delivery schedule in the Agreement), ZTE delivered the Products to PTA-FLA in Jacksonville, Florida.

14. From September 2006 through July 2008, PTA-FLA paid ZTE a sum of $3,600,000 pursuant to the terms of the contract, the full price of $3,800,000 less an agreed upon holdback of $200,000 for components of the system that were still not working as of July 15, 2008 (i.e., MMS, CALEA, E911 and LNP).

15. Immediately after delivery of the Products by ZTE, PTA-FLA began to set-up and test the equipment for use in its cellular network.

16. The Products had some functionality, but were not fully operational or conforming goods. These limitations were not realized by PTA-FLA until the network was put into commercial service in or around September 2007.

17. Throughout the deployment PTA-FLA notified ZTE of the numerous issues with the Products and ZTE assured PTA-FLA that it would remedy the defects. ZTE not only failed

to remedy the defects, but on many occasions made attempted fixes in the middle of operating periods instead of the nighttime maintenance window when customers would be least affected.

18. On September 1, 2007, PTA-FLA began selling handsets for use on its cellular network.

19. It became apparent through the use of the cellular network by PTA-FLA's customers that the Products were defective, lacked functionality, or had limited functionality. The problems with the Products included, *inter alia*, their inability to comply with general market standards such as Evolution-Data Optimized ("EVDO") and Code Division Multiple Access ("CDMA"), non-functioning MMS ("picture mail") and LNP, non-functioning handsets, problems complying with U.S. law enforcement and emergency assistance standards (CALEA and E911), inability to access the internet, high pitched signals being sent through the handsets, and frequent network outages.

20. When PTA-FLA notified ZTE of these defects, ZTE assured PTA-FLA that it would remedy all defects.

21. ZTE's proposed solutions were not effective and in some instances a fix of one problem would cause other problems in the network. Each time PTA-FLA notified ZTE of the continued non-functionality, ZTE continued to assure PTA-FLA that it would remedy the defects in the Products.

22. Although PTA-FLA expended significant human (and capital) resources in an effort to work with ZTE to ensure that the Products were in working condition, PTA-FLA personnel encountered significant problems in working with ZTE engineers, such as: missed meetings and appointments, limited English-speaking capabilities, lack of familiarity with their own products, not following standard U.S. procedures such as implementing fixes during a

maintenance window and having a back-up plan when a fix fails or in fact breaks something else, and inability to identify and diagnose problems.

23. The problems persisted throughout 2008 and caused significant customer-service problems and damage to PTA-FLAs's relationship with vendors and customers in Jacksonville.

24. During 2008, PTA-FLA attempted to sell some of its assets in the Jacksonville market to Metro PCS. Metro PCS would not purchase the ZTE Products and in fact required PTA-FLA to remove the Products from the network it ultimately purchased from PTA-FLA.

25. Although the Products still were not functioning, in an attempt to resolve the issues with the Products amicably, at or around the time of the sale to Metro PCS, PTA-FLA agreed with ZTE to take the non-functioning Products out of service in the Jacksonville market and move them to a Tennessee market, based on ZTE's assurances that it could cure the defects in the Products upon installation in Tennessee.

26. At no time during the discussions concerning the move of the Products to Tennessee did PTA-FLA ever state that it was waiving its rights under the Agreement by permitting ZTE to cure the defective goods in Tennessee. Moreover, at no time during these discussions did ZTE ever mention that movement of the Products to Tennessee could damage the Products – rather, they continuously assured PTA-FLA that they could make the Products functional in Tennessee.

27. In or around November 2009 the Products were installed in Tennessee, where a company related to PTA-FLA, NTCH West Tenn., Inc. was operating.

28. After that time, PTA-FLA continued to experience the same problems and defects with the Products as had been present in Jacksonville.

29. PTA-FLA notified ZTE of the problems associated with the Products. ZTE initially blamed the problems on third parties or PTA-FLA and refused to take meaningful steps to correct the problems, but when PTA-FLA conclusively demonstrated that the problems were caused by ZTE, ZTE assured PTA-FLA that it would remedy the defects.

30. Despite ZTE's assurances, the problems persisted. For example, despite having years to fix the problem, MMS was still not functional. When PTA-FLA notified ZTE of the continued problems, ZTE acknowledged for the first time that PTA-FLA was merely a platform for experimentation in the United States market. Specifically, Neil Kushner stated that he was not surprised that the MMS system was not working properly since ZTE had never sold the system in the United States before. This statement was directly contrary to the assurances PTA-FLA received prior to entering into the Agreement that ZTE's equipment would function in the U.S. Furthermore, the individual stated in an email:

> The MMS issue I agree has been quite vexing but there is a cultural issue here at play as folks back in China claim there is a 'standard' not being met and they got hung up on this rather than fix the anomaly.

ZTE again assured PTA-FLA that despite these "cultural issues" and unwillingness by ZTE's Chinese headquarters to fix the problem, ZTE would cure the defects in the Products.

31. To date, ZTE has failed to cure the defects in the Products. During the time following deployment until the middle of 2010, PTA-FLA was forced to abandon the use of certain non-functioning Products, including MMS and EVDO devices because their continued malfunctioning was jeopardizing PTA-FLA's reputation in the marketplace. At substantial expense to PTA-FLA, PTA-FLA engaged third parties to try and assist in making ZTE's products work. In some cases, it was only after these outside experts clearly showed ZTE what was wrong with its own equipment that they stopped trying to blame PTA-FLA and instead

undertook to remedy the issues, which led to a series of failed attempts, broken promises, missed deadlines, and ultimately a failure to remedy the problems on ZTE's part. PTA-FLA then decided to replace the ZTE network alltogether and is currently installing a competing system on its towers and agreeing to move its subscribers over to that network at substantial expense.

32. As a result of ZTE's failure to live up to its promises to provide confirming goods and fulfill its obligations under the Agreement, on April 16, 2010, PTA-FLA requested a meeting with the senior U.S. executive of ZTE as required by the dispute resolution provision in the Agreement. The initial request was ignored, as were multiple follow-up requests made by PTA-FLA over a period of several months. ZTE eventually agreed to a meeting in principle, but the meeting never occurred. On multiple occasions, ZTE's senior U.S. executive failed to show up for a planned meeting, causing PTA-FLA to incur substantial travel expense and loss of time.

33. When a meeting was eventually held (months after the 15 day time period required by the Agreement), it was not with the senior executive called for in the Agreement, but rather with the sales person on PTA-FLA's account, who showed up late, interrupted the meeting to take phone calls, left the meeting, and terminated the meeting short of the time required by the Agreement. After months of delay in arranging for an actual meeting with the person called for in the Agreement, PTA-FLA was again made to travel to ZTE for the meeting and, contrary to the language in the Agreement, this person showed up with legal counsel. This individual failed to work toward a resolution as had been agreed and, five months after the meeting, has failed to live up to his promise to conduct a follow-up meeting within two weeks.

34. To date, ZTE has refused to have a meeting in compliance with the Agreement, has refused to cure the defective Products, and has refused to refund any of the $3,600,000.00 PTA-FLA paid.

35. All conditions precedent to the bringing of this action have occurred, have been satisfied or otherwise have been waived.

**COUNT I**
**(BREACH OF WARRANTY)**

36. PTA-FLA realleges paragraphs 1 through 35 above and incorporates the same herein by this reference.

37. This is an action against ZTE for breach of warranty.

38. Under the terms of the Agreement, ZTE expressly warranted the Products to comply with ZTE's standard published commercial specifications and to be free of defects in workmanship and material.

39. The Products failed to comply with ZTE's standard published commercial specifications and were defective in workmanship and material.

40. PTA-FLA notified ZTE of the defects in the Products on numerous and continuing occasions from the initial receipt of the Products through the present.

41. ZTE has failed, and continues to fail, to remedy the defects in the Products.

42. PTA-FLA has been damaged by ZTE's breach of the express warranties under the Agreement.

**WHEREFORE**, Plaintiff, PTA-FLA, demands entry of judgment in its favor and against Defendant, ZTE, for monetary damages, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

**COUNT II**
**(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)**

43. PTA-FLA realleges paragraphs 1 through 35 and 38 through 42 above and incorporates the same herein by reference.

44. This is an action against ZTE for breach of the covenant of good faith and fair dealing.

45. ZTE failed to use reasonable efforts to cooperate with PTA-FLA in its efforts to utilize the Products and ensure that they met the standards set forth in the Agreement.

46. ZTE did not provide personnel that was sufficiently competent or willing to address the problems with the Products. As a result of ZTE's actions, PTA-FLA suffered a significant loss of time and resources in its attempts to work with ZTE to implement solutions to the problems PTA-FLA experienced.

47. PTA-FLA has been damaged by ZTE's breach of the covenant of good faith and fair dealing.

WHEREFORE, Plaintiff, PTA-FLA, demands entry of judgment in its favor and against Defendant, ZTE, for monetary damages, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

**COUNT III**
**(RESCISSION)**

48. PTA-FLA realleges paragraphs 1 through 35 above and incorporates the same herein by this reference.

49. This is an action against ZTE for rescission of the Agreement.

50. The Products delivered by ZTE were non-conforming with the terms of the Agreement.

51. PTA-FLA accepted the Products delivered by ZTE based on assurances from ZTE that the nonconformity would be seasonably cured.

52. ZTE failed to seasonably cure the nonconformity of the Products.

53. PTA-FLA notified ZTE of the revocation of its acceptance of the Products in accordance with Fla. Stat. § 672.608, but ZTE has failed or refused to accept the return of the Products.

54. PTA-FLA has been damaged by ZTE's failure to cure the nonconformity of the Products and is entitled to cancellation of the Agreement and a return of the price paid along with monetary damages.

**WHEREFORE**, Plaintiff, PTA-FLA, demands entry of judgment in its favor and against Defendant, ZTE, for rescission of the Agreement and damages, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

**COUNT IV**
**(FRAUD IN THE INDUCEMENT)**

55. PTA-FLA realleges paragraphs 1 through 35 and 38 through 42 above and incorporates the same herein by this reference.

56. This is an action against ZTE for fraud in the inducement.

57. ZTE represented to PTA-FLA that ZTE's products would allow for the use of Multimedia Messaging Service ("MMS" or picture mail), internet access, Local Number Portability ("LNP"), CALEA (Communications Assistance to Law Enforcement Agencies), E911 (wireless 911 calling and location identification) and other standard features expected by cellular users and that ZTE's products would have full functionality in the U.S.

58. ZTE's products did not in fact allow for the use of Multimedia Messaging Service ("MMS" or picture mail), internet access, Local Number Portability ("LNP"), CALEA

(Communications Assistance to Law Enforcement Agencies), E911 (wireless 911 calling and location identification) and other standard features expected by cellular users, nor did they provide full functionality in the U.S.

59. ZTE knew, or should have known, that this representation was false.

60. ZTE intended for PTA-FLA to rely on the misrepresentation when entering into the Agreement with ZTE.

61. PTA-FLA relied on the misrepresentation to its detriment when entering into the Agreement.

62. As a result of PTA-FLA's reliance on the misrepresentation, PTA-FLA has been damaged.

**WHEREFORE,** Plaintiff, PTA-FLA, demands entry of judgment in its favor and against Defendant, ZTE, for rescission of the Agreement and damages, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

**ROGERS TOWERS, P.A.**

L. Javan Grant
Florida Bar Number: 0799521
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
(904) 398-3911 (phone)
(904) 396-0446 (facsimile)

ATTORNEYS FOR PLAINTIFF

ZTE中兴 Master Supply Agreement Version 8-17-06

# MASTER SUPPLY AGREEMENT

This Master Supply Agreement (the "Agreement") is entered into and made effective as of _September 21, 2006 (the "Effective Date") by and between:

ZTE USA, Inc. ("ZTE") having a place of business at 2425 Central Expressway, Suite 323, Richardson, TX 75080; and PTA-FLA, Inc. dba ClearTalk ("Customer") having a place of business at 10110 Leisure Lane, Jacksonville, FL 32256.

WHEREAS, ZTE is a manufacturer and/or supplier of certain telecommunications Products *(defined herein as equipment, hardware, and associated materials, exclusive of software content)*, related Software Licenses, and/or Installation, Engineering and Training Services.

WHEREAS, Customer desires to acquire from ZTE various Products, related Software Licenses, and/or Installation, Engineering and Training Services Equipment all as described herein below and under the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing premises and the covenants herein contained the parties agree to be bound as follows:

## 1. Listing of Schedules

One or more of the following Schedules may be attached hereto and shall be deemed applicable to and incorporated into this Agreement:

**Schedule 1 "Description of Project"**
**Schedule 2 "Share of Responsibilities (SOR)"**
**Schedule 3 "Bill of Materials and Delivery Dates"**
**Schedule 4 "Specifications"**
**Schedule 5 "Guaranteed future pricing caps"**
**Schedule 6 "Training Schedule"**
**Schedule 7 "Acceptance Test Procedure"**
**Schedule 8 "Vendor Financing Agreement"**
**Schedule 9 "Equipment Provided Switch Room"**
**Schedule 10 "Tennessee Market Budgetary Price"**



EXHIBIT A

## 2. The Project

Customer intends to implement a telecommunications project ("The Project") as described in Schedule 1 "Description of Project" attached hereto. In connection therewith, the parties shall perform those certain respective obligations and tasks as described in the attached Schedule 2 "Share of Responsibilities (SOR)" and in accordance with the terms hereof.

## 3. Ordering of Equipment, Software Licenses, and Services

Customer shall timely issue Purchase Orders or other written documents to ZTE to acquire required Products, related Software Licenses, and/or Installation, Engineering and Training Services, such items including those described in Schedule 3, "Bill of Materials and List of Deliverables" with the pertinent specifications thereof, if any, being as described in Schedule 4 "Product Specifications".

Each Purchase Order after the initial purchase order reflected in the attached Schedule 3 shall be subject to ZTE's acceptance and confirming written (including email or fax) acknowledgment, if not promptly acknowledged it will only be because the purchase order does not conform to this agreement. The delivery date(s) for such Products, Software, and/or Installation, Engineering and Training Services shall be in accordance with that shown in Schedule 2 "Share of Responsibilities (SOR)" or as stated in Schedule 3 attached. The issuance and subsequent acceptance of any such Purchase Order, or the mutual execution by the parties of any similar written ordering document, shall establish a purchase agreement between Customer and ZTE in accordance with and subject to the terms and conditions in this Master Supply Agreement and the Schedules attached hereto.

## 4. Prices

After the initial order, Prices for Subsequent Products, related Software Licenses, and/or Installation, Engineering and Training Services are in US Dollars and are not to exceed those prices set forth in Schedule 5 "Guaranteed future Price Caps" attached hereto. Prices set forth in Schedule 5 may if in accordance with the market for competitive products be increased by up to 5% annually commencing January 1 of 2009.

The prices are CIF and as such equipment will be delivered to the nearest US Port of customers selection however USA domestic transportation charges, non-standard packing, and any applicable sales taxes, or other similar impositions as may be payable by ZTE All such additional itemized charges are to be reimbursed to ZTE by Customer.



2 &C

5. Payment Terms

The full purchase price for Products and related Software Licenses and Services, and any associated prepaid freight transportation charges, insurance costs and taxes as itemized on ZTE's invoice(s), shall be due and payable in US Dollars as follows:

a) 10% of the total purchase price upon issuance by Customer of the Purchase Order; and (See Schedule 3 for details)

b) with the remaining 90% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to Schedule 7 "Acceptance Test Procedure", or when commercial use of the Products is made by Customer following such Acceptance, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE If not returned as not suitable for the intended function., whichever first occurs, such invoiced amount being payable pursuant to the provisions of Schedule 8 "Vendor Financing Agreement" attached hereto.

However any further major system purchases exceeding $1,000,000 US on a single purchase order will be financed under the same provisions as Schedule 8, provided that Cleartalk is not in default in its payment obligations thereunder, as long as the total outstanding balance to ZTE including the new purchase order does not exceeds the 2 times the collateralized asset or the amounts previously paid ZTE by Customer or its affiliates.

1. 30% of down-payment will be made upon issuance by Customer of the Purchase Order
2. with the remaining 70% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to Schedule 7 "Acceptance Test Procedure", or when commercial use of the Products is made by Customer Following the Acceptance Testing, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE if not returned as not suitable for the intended function, whichever first occurs, such invoiced amount being payable pursuant to the provisions of Schedule 8 "Vendor Financing Agreement" attached hereto.

It is further understood and agreed that all past due undisputed balances will bear interest at one and one-half percent (1 1/2%) per month (or at the maximum interest rate allowed by law if such interest rate is lower), and that Customer shall pay to ZTE upon demand any charges or costs, including reasonable attorneys fees, incurred in connection with the collection of any past due amount.

6. Delivery



8 48

ZTE will pack the Products purchased hereunder for transport in accordance with its commercial standards and will deliver Products to a carrier selected by ZTE. Prices are C.I.F Jacksonville, FL USA or such other Port as Customer may designate. Transportation charges and insurance charges from the C.I.F. point to Customer's specified delivery destination or site are Customer's responsibility and if prepaid by ZTE, and approved in advance by Cleartalk, will be so identified in ZTE's invoice or will be separately invoiced to Customer. Those items listed within Schedule 3 scheduled for delivery on October 23, 2006 upon payment of the initial payment will be immediately placed into production for shipment to the United States To meet that delivery date on Execution of this agreement and receipt of the payment set forth in Schedule 3.

## 7. Risk of Loss

Customer assumes all risk of loss, damage or destruction of the Products upon ZTE's delivery to the C.I.F. point and any loss, damage or destruction of the Products thereafter shall not relieve the Customer of its obligations to pay the full purchase price therefor. Provided these goods are designed and packaged in a manner to reasonably be delivered ultimately into commercial service without loss.

## 8. Transfer of Title

Title to the Products shall be deemed to pass from ZTE to Customer in accordance with the terms of Schedule 8 "Vendor Financing Agreement". Title to the Software provided with the equipment as described herein shall at all times remain with ZTE, or with the various suppliers to ZTE whose software or software components are contained in the Software and whose rights of ownership are maintained through restrictive agreements with ZTE.

Title to any software used by Cleartalk in providing its services whether interfacing with ZTE Software or contributed to by ZTE engineers or not will remain with Cleartalk in the absence of a separate agreement regarding this Software.

## 9. Security Interest

It is understood that ZTE retains a security interest in all items delivered to Customer in accordance with and for the duration described in Schedule 8 "Vendor Financing Agreement", and Customer agrees that during such period that said security interest is in effect, it will keep such items free and clear of all other liens and claims of any kind, that it will not remove or deface any labels or other markings evidencing the security interest of ZTE, and that it will not move such items from the delivery destination without ZTE's consent. Customer also agrees to execute, and further authorizes ZTE to execute in Customer's name, any financing statement or other similar document deemed necessary by ZTE to perfect and protect its security interest. Customer consents to and agrees to assist in the filing of all such documents with appropriate authorities. ZTE agrees to

release individual base stations from this security interest in proportion to the payments they have received from Cleartalk or its Guarantors on its obligations if requested to do so by Cleartalk.

## 10. Software License

ZTE hereby grants to Customer, and Customer accepts, a personal, non-exclusive, non-transferable and restricted right and license to use the Software comprising the subject matter of a purchased Software *License*, further subject to the provisions and limitations as set forth below:

(A) the Software and any supporting documentation furnished hereunder is to be used by Customer for its own business activities solely in conjunction with the normal and intended use and operation of the Products purchased hereunder, the Products and Software together constituting a Licensed System;

(B) the right of Customer to use the Software is now and throughout the term of the license contingent upon the payment by Customer to ZTE of all applicable fees;

(C) licensed use is limited to the executable software as delivered by ZTE to Customer and does not permit modification or use of any modified form of the Software, notwithstanding any claim by Customer of any defect in the Software; Customer may not duplicate the Software, except to make a backup copy of the software for use in the event of system failure;

(D) the Software and any documentation furnished are the property of ZTE and are to be considered ZTE proprietary information; Customer shall not disclose, provide or otherwise make available the Software or documentation, or any part thereof, in any form, to any third party, before or after termination of this Agreement, except as may be permitted in writing by ZTE; Customer shall immediately notify ZTE, in writing, of any knowledge that any unlicensed party possesses the Software or documentation; Customer shall safeguard said Software and documentation with the highest degree of care and diligence;

(E) any configuration, application, or arrangement of the Software and its systems into networks, shall not be considered a derived product with any distinction in ownership from that of the Software as received by Customer;

(F) any distinct and separate element of software in the form of instruction macros, test cases, simulation data, or similar forms of intellectual property, which is produced by normal use of the Software and is initially dependent upon the Software for execution, shall be considered a derived product to which ZTE retains title and to which Customer is granted an exclusive right to use solely in its dependent form, and in conjunction with, the Software licensed hereunder and the Licensed System;

(G) the Software provided to Customer under this Agreement is in object code format; Unless software modification is needed for market operations, ZTE expressly prohibits, and Customer agrees to refrain from, any attempt by Customer or Customer's agent(s) to tamper with, disassemble, reverse compile, reverse engineer, or, in any similar way, expose the actual instruction sequences, internal logic, protocols, algorithms or other intellectual property represented within the Software, which ZTE considers to be its proprietary information and trade secret whether or not said intellectual property is included in any patent or copyright; Any product derived from, or resulting from, such effort by Customer or any other party shall be deemed the

property of ZTE, for which no right to use is granted to Customer herein and for which ZTE shall bear no obligations for support;

(H) this Software License, and the rights and obligations of Customer shall not be pledged, mortgaged, assigned, sub-licensed or otherwise transferred or disposed of, including by operation of law, in whole or in part, by Customer unless consented to in writing by ZTE; except that Customer shall have the right, in association with a resale of a Licensed System or related services to an end-user, to sublicense the use of the Software to such end-user pursuant to a software license agreement containing terms substantially similar to those contained herein;

(I) the license granted herein shall continue for so long as the Licensed System upon which the Software is running remains in service by Customer, unless Customer is delinquent making any required payments to ZTE or is in breach of this agreement or in material violation of any of its terms, or as may be provided elsewhere herein, in which event the license granted herein shall terminate upon written notification thereof to Customer by ZTE; Upon termination of the license, all use of the Software by Customer shall immediately cease and all copies of the Software and related documentation shall be immediately returned by Customer at its expense to ZTE.

(II) ZTE agrees to only have the access to this network and information on the Subscribers of Customer, when installed, that is specifically authorized by customer and will agree to train Customer in a specific procedure that Customer can implement in less than 5 minutes time that will cut off any access to the Network from any or all outside parties without impacting the function of the network. If Customer chooses to have this process verified by an independent outside source and it is found to not work for its stated purpose, ZTE will pay all charges related to this investigation and any remediation to make this conform. If any functionality is found in the network designed for the purpose of Spying or that could be used to disable the network by those intending harm to Customer, its customers, or its country, if not clearly inadvertent will be reason for Customer to suspend all payments due to ZTE and submit a complaint to the dispute resolution function later described in this agreement, and if such functionality is reasonably determined to be intentional or not correctible, ZTE will be responsible for the cost of replacement of this network with a network of Customers choosing.

## 11. Taxes

Prices for Products, Software Licenses and/or Installation or Training Services do not include any state, federal, national, county or local sales, use or excise taxes (or other duties, fees, or similar charges however designated) applicable to this transaction, and the Customer expressly agrees to pay to ZTE, (in addition to the Prices specified), the amount of any such taxes that may be imposed upon and therefore payable by ZTE as shall be determined by the shipping destination specified by the Customer. All applicable taxes, duties, fees and similar costs incurred will be billed to the Customer by ZTE unless Customer's Purchase Order is accompanied by valid tax exemption certificates or equivalent legal waiver documents. It is further understood that any and all taxes, customs or duties which may be imposed on payments by the Customer to ZTE for Products, Software Licenses and/or Installation or Training Services are the sole obligation of the Customer and may not be deducted from amounts due to ZTE hereunder. Notwithstanding the foregoing, Customer shall not be liable for any taxes imposed upon or made payable by ZTE against the net income of ZTE.

## 12. Termination

If the Customer petitions to reorganize under a Bankruptcy Act or is adjudicated bankrupt or if a receiver is appointed for the Customer's business or if the Customer makes an assignment for the benefit of creditors or fails to make payments of any undisputed sum due hereunder, ZTE will have the immediate right to terminate this Agreement, cease all further performance, and enter the Customer's premises for the purpose of repossessing and removing any items subject to a security interest in favor of ZTE and all ZTE-owned Products and/or Software. ZTE's termination of this Agreement or such taking of possession will be without prejudice to any other rights and remedies that ZTE may have. The Customer's obligation to pay all ZTE invoices as may be accrued will survive any termination action. The provisions of this paragraph relating to termination and repossession shall have force and effect only if and then to the extent that the entire then outstanding indebtedness of Customer to ZTE is not fully and unconditionally secured by a bank Letter of Credit pursuant to the terms of **Schedule 8 "Vendor Financing Agreement"**.

## 13. Warranty Provisions

Subject to the limitations stated herein, Products manufactured by ZTE (exclusive of Software originated and supplied by ZTE) is warranted to comply with ZTE's standard published commercial specifications and to be free of defects in workmanship and material at the time of delivery to the Customer for a period of Eighteen (18) months. Software originated and supplied by ZTE is warranted to substantially perform in accordance with the published ZTE specifications for a period of Eighteen (18) months. Notice of any claimed defect must be given in writing during the warranty period. Any Products or Software supplied by but not of ZTE's manufacture or origination shall be subject only to the warranty of the manufacturer or originator thereof, which warranty shall be conveyed and assigned to the Customer. Such warranty will also apply to the reasonable functioning of software and hardware purchased by Customer for the Purpose described in attachment 1.

ZTE will either repair, correct or replace any such defective Product of its manufacture or defective Software of its origin and supply, with new or equivalent Products or Software so as to make the Product or Software conform to this warranty, , provided that:

(A) If ZTE provides packing material and prepays for shipping, the defective Product or Software is returned to ZTE at its designated US location, transportation prepaid and risk of loss borne by Customer, in accordance with ZTE's instructions including a Returned Material Authorization (RMA) which shall be promptly given;



Ł 4ł

(B) an inspection of the returned Products or Software by ZTE clearly indicates the defect was not caused by abuse, or improper use, maintenance, repair, installation or tampering or alteration;

Such option is only available in the event that Customer is able to maintain daily operations without interference due to the defective equipment. In the event a defective product causes intrusion of daily operations, ZTE must choose the most immediate recourse to correct the issue.

Any equipment, accessory, or part repaired or replaced by ZTE pursuant to the terms of this warranty shall be returned to Customer transportation prepaid and risk of loss borne by ZTE, and continue to be warranted for period of 12 months.

The Product and Software warranties herein shall be deemed to have commenced upon the first to occur of successful completion of testing pursuant to Schedule 7 "Acceptance Test Procedure", commercial use of the Products by Customer, or one (1) year following issuance by Customer of the initial Purchase Order Provided such item warranted is at that time reasonably performing its intended function in Customers network. .

Any Replacement parts or repairs to defective parts performed after the warranty period will be priced to customer at there reasonable percent value as related to the price of a new component sold to Customer as set forth in the pricing agreement hereto.

ZTE warrants that its Installation, Engineering and Training Services shall be performed in a good and workmanlike manner and that any related installation material supplied by ZTE shall be free from material defects in workmanship. If the Services provided shall be found defective within one (1) year from the date of completion of said Services, ZTE shall fulfill this warranty through repair or replacement of any installation materials and/or correction of installation errors provided written notice of the claimed defect is given to ZTE promptly upon discovery and in any event, within the services warranty period.

IN THE ABSENCE OF A SEPARATE SERVICE OR MAINTENANCE AGREEMENT BETWEEN ZTE AND CUSTOMER CONTAINING NEGOTIATED TERMS, SERVICE LEVELS, AND PRICES, THE FOREGOING WARRANTY PROVISIONS SHALL CONSTITUTE ZTE'S ENTIRE LIABILITY AND CUSTOMER'S SOLE RIGHT AND REMEDY WITH RESPECT TO DEFECTIVE PRODUCTS, SOFTWARE, AND/OR INSTALLATION SERVICES, WHETHER CLAIMS ARE MADE OR REMEDIES ARE SOUGHT IN CONTRACT OR TORT OR UNDER ANY OTHER LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE).



49

8

THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE PROVISIONS STATED HEREIN. THERE ARE NO WARRANTIES EITHER EXPRESSED OR IMPLIED OR ANY AFFIRMATION OF FACT OR REPRESENTATION EXCEPT AS SPECIFICALLY SET FORTH HEREIN.

**14. Excusable Delays**

ZTE will not be liable for delays in performance or a failure to perform hereunder due to unforeseen interruptive circumstances or causes beyond its control including, but not limited to, acts of God, acts of any government, wars, riots, fires, floods, accidents, strikes, or embargoes In the event of such delays the schedules shall be extended for such additional period of time as is determined to be equitable by the parties.

**15. Substitutions and Modifications**

ZTE reserves the right, at any time before delivery or acceptance, whichever is later, to modify, replace or substitute Products or their components of its manufacture, or materials procured from its suppliers, and relevant Software to be supplied, provided that such modification, replacement or substitution does not adversely affect the operational requirements or performance or maintenance of the particular Products and Software to be delivered and will not result in additional charges to Customer.

**16. License and Permits**

Any licenses or permits required by any State, municipality or other governmental body to install, provide or operate the Products or Software or services furnished by ZTE shall be the responsibility of the Customer. ZTE is responsible for any US government and FCC compliance at the time of shipment. Any quotation, offer, or sale by ZTE involving the export or transfer of Products and/or Software outside of the United States is subject to and conditioned upon compliance with the export control laws of the U.S., including the issuance of an export license by the appropriate U.S. government department or agency to the extent required by law.

Any modifications to software or equipment required to meet Government mandates after delivery of the equipment will be performed by ZTE at a rate reasonable derived to yield to ZTE a profit of no more than 10% on this service.

**17. Confidential Information**

Customer acknowledges that it has or will come into possession of valuable proprietary information and trade secrets of ZTE and visa versa during the negotiation of this



45

8

agreement and/or the performance by ZTE hereunder or during the installation, operation, and/or use by Customer of the Products and Software provided hereunder. Customer and ZTE expressly agree to maintain all such proprietary information and trade secrets in strict confidence, to take all precautions reasonably necessary to protect same from disclosure to third parties, and to not use such proprietary information or trade secrets for any purpose inconsistent with the Order and the transaction contemplated herein or otherwise to the detriment of ZTE or Customer. Proprietary information shall include, without limitation, technical, engineering or business or financial information or data conveyed in written, graphic, or other tangible form, or by oral conveyances, clearly identified as, or reasonably known to be, proprietary, confidential, or company private. All Product specifications, descriptions, computer programs, flowcharts, diagrams, manuals, schematics, development tools, design documents, business plans, business execution methods and prices comprise ZTE and or Customer proprietary information.

The foregoing confidentiality restrictions and obligations of the Customer, however, shall not extend to any part of the proprietary information which: (1) was already known to Customer without restriction as to its use at the time of its disclosure by ZTE as can be established by written documentation; (2) was known or was generally available to the public at the time of disclosure hereunder; (3) becomes known or generally available to the public (other than by act of Customer subsequent to its disclosure hereunder); (4) is disclosed or made available in writing to Customer without restriction by a third party having a bona fide right to do so; (5) is independently developed by Customer without the use of ZTE's proprietary information as can be established by written documentation; or (6) is required by law to be released (but only after prior written notice to ZTE providing ZTE with a reasonable opportunity to intervene to appropriately protect its information).

It is understood that breach or violation by Customer or ZTE of these confidentiality restrictions and obligations will cause irreparable harm to ZTE or Customer and ZTE or Customer shall accordingly have the right to enforce these obligations through injunctive relief and/or to obtain other appropriate remedies and relief, including the recovery of costs and attorney's fees. The provisions herein shall expressly survive the termination of this agreement.

## 18. Assignment

In the absence of prior written consent of ZTE, which consent will not be unreasonably withheld, conditioned or delayed, Customer shall not assign this Agreement, any Purchase Order, or any of its rights and obligations hereunder. It is agreed that Customer can assign this agreement to any party purchasing or acquiring substantially all its assets in a given market except that if the acquiring party does not have the financial standing of Customer ZTE can request reasonable financial assurances including a Bank Letter of Credit covering outstanding balances or payment of such amounts. ZTE may assign any Purchase Order(s) and its rights and obligations hereunder (or may delegate the performance of its obligations) to any affiliated organization which in all respects is and



8 45

shall be bound by such obligations, it being understood that ZTE shall thereupon be released from any liability to Customer with respect to the subject matter of said assignment or delegation. Subject to the foregoing, the Purchase Order and the terms and conditions hereof shall pass to the benefit of, and be binding upon, the heirs, successors, administrators, executors and assigns of the parties.

## 19. Infringement

ZTE agrees that it will defend at its own expense, all suits against Customer for infringement of any U.S. copyright, patent, or similar third party intellectual property right covering, or alleged to cover, ZTE designed and manufactured Products or Software in the form furnished by ZTE and ZTE agrees that it will pay all sums which, by final judgment or decree in any such suits, may be assessed against Customer on account of such infringement, provided that ZTE shall be given (a) immediate written notice of any claims of any such infringement and of any suits brought or threatened against Customer and (b) authority to assume the sole defense thereof through its own counsel and to compromise or settle any suits so far as this may be without prejudice to the right of the Customer to continue the use, as contemplated, of the Material furnished or to be furnished. If in any such suit so defended the Product or Software is held to constitute an infringement and its use is enjoined, or if in the light of any claim of infringement ZTE deems it advisable to do so, ZTE may procure the right to continue the use of the same for the Customer, or replace the same with non-infringing Product or Software, modify same so as to be non-infringing, or accept the return of Product or Software and refund the price paid therefor by Customer, less a reasonable adjustment for the Customer's prior beneficial use of the Product or Software and for wear and tear.

Customer agrees that the foregoing indemnification shall not apply, and moreover shall be extended to ZTE, under circumstances where the infringement claim is based on a requirement or usage by the Customer that is not normal in the industry and unknown to ZTE and is inconsistent with ZTE's standard published documentation governing the proper application and use of the Products or Software designed and manufactured by ZTE and supplied in fulfillment of Customer's order.

The defense and indemnification against infringement or related claims which cover any Products or Software supplied by but not of ZTE's manufacture or origination shall not be the responsibility of ZTE, but rather shall be the responsibility of the manufacturer or originator thereof to the extent that such an indemnity has been provided, which indemnity shall be conveyed and assigned to the Customer.

## 20. Governing Law and Binding Arbitration

This Agreement shall be governed by the laws (without giving effect to its conflict of laws principles) of the State of Forida; and nothing in this Agreement affects any statutory rights of consumers that cannot be waived or limited by contract. The parties

expressly disclaim the applicability of the United Nations Convention for the International Sale of Goods. Should any dispute, claim or controversy occur between the parties arising out of or related to this Agreement, one party may give written notice of the dispute to the other party. The parties shall then, in the first instance, attempt to resolve such dispute or controversy in good faith by senior level negotiations between the parties without attorneys present with a view to resolving the dispute within a period of fifteen (15) business days from the day notice of the dispute was given (the "Resolution Period"). Such negotiations shall include a personal meeting of at least four (4) hours duration attended by the senior U.S. executive of each of the parties. If the parties are unable to resolve the dispute within the Resolution Period, either party may, within ten (10) business days after the end of the Resolution Period, initiate an arbitration proceeding which shall be administered by the International Centre for Dispute Resolution of the American Arbitration Association ("AAA") in accordance with its International Arbitration Rules. The place of arbitration shall be Jacksonville, Florida. The language of the arbitration shall be English. The parties to this Agreement expressly agree that any order or award of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Unless otherwise agreed in writing, the costs of any arbitration shall be shared equally between the parties.

**21. Limitation of Liability**

**NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ZTE SHALL NOT BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, REMOTE, OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO THE LOSS OF DATA, REVENUE OR PROFITS), EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, RESULTING FROM OR ARISING OUT OF ITS PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT, OR FROM ANY FAULT, FAILURE, DEFICIENCY, OR DEFECT IN THE PRODUCTS, SOFTWARE, AND/OR SERVICES, OR FROM THE USE OF OR THE INABILITY TO USE THE PRODUCTS, SOFTWARE AND/OR SERVICES EITHER SEPARATELY OR IN COMBINATION WITH OTHER EQUIPMENT OR SOFTWARE, OR FROM ANY OTHER CAUSE.**

**FURTHER, IN NO EVENT SHALL ZTE BE LIABLE UNDER ANY LEGAL THEORY OF RECOVERY OR FOR ANY OTHER REASON FOR LOSSES OR DAMAGES OF ANY KIND WHICH EXCEED THE PURCHASE PRICE PAID BY CUSTOMER HEREUNDER.**

**22. Market Presence Provision**

In the unlikely event that ZTE or a successor thereof withdraws from and abandons the US market anytime within four (4) years (the "Period") following the date that Customer

issues its initial Purchase Order to ZTE hereunder, ZTE agrees to refund all moneys paid by Customer to ZTE under this Agreement during said Period up to the date of withdrawal.

23. **Compliance with Laws**

Each party agrees to comply with all applicable laws, orders and regulations of all foreign, federal, state and local governmental authorities, including all applicable export and import laws and regulations.

24. **Headings**

The headings appearing at the beginning of the several sections contained in this Agreement have been inserted for convenience only, and neither those headings, nor their order or placement, shall be used in the construction and interpretation of this agreement.

25. **Severability**

If any provision of this agreement is determined to be invalid, illegal or unenforceable, such provision shall be severed from this agreement and the other provisions shall remain in full force and effect.

26. **Waiver**

The failure of either party at any time to require performance by the other of any provision hereof shall not affect the right of such party to require performance at any time thereafter, nor shall the waiver of either party of a breach of any provision hereof be taken or held to be a waiver of a provision itself. No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the party against which such waiver or discharge is sought to be enforced.

27. **Counterparts**

This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

28. **Entirety of Agreement –Modifications to Schedules**

The provisions hereof are all of the terms, conditions and agreements of the parties regarding the sale of Products, and related Software Licenses and/or Installation Services



JS

and take the place of any pre-printed provisions that may appear anywhere on Customer's Purchase Order, which provisions have been expressly rejected. No modification(s) or amendments to these terms and conditions will be valid unless stated in writing and signed by duly authorized representatives of both ZTE and the Customer. All schedules may be amended from time to time upon mutual consent of the parties to add deliverables and for other matters.



8 85

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their respective names.

ZTE USA, Inc.

By: [signature]
Name:

Title: CEO

PTA-FLA, Inc. dba ClearTalk

By: [signature]
Name: Eric Steinmann

Title: Development Manager

## SCHEDULE 1

### GENERAL DESCRIPTION OF PROJECT

Cleartalk will be leveraging ZTEs all IP CDMA 2000 platform to provide 1x, data and voice services in their Jacksonville market. In addition Cleartalk has been provided budgetary pricing for Cleartalk's Tennessee market and provided ZTE with right of first refusal ( see Schedule 10) ZTE will provide Cleartalk with EVDO Rev A. operating on 14 BTS in Jacksonville. ZTE will be providing Cleartalk as stipulated in Schedule 3 with OTA, SMS, MSC, BSC, MGW, PDSN, HLR, OMC (supervisory positions) and 10 outdoor S1 BTS, 2 S111111 indoor BTS with RF heads, 63 S111 outdoor BTS, 3 S111111 outdoor BTS with RF heads, and 20 S111111 indoor (macro) BTS. In total 98 BTS. Note: Cleartalk will be providing, DSX equipment, Voice Mail, Pre-paid subsystems in concert with ZTEs CDMA 2000 platform and aforementioned equipment. The ZTE all IP CDMA 2000 platform will be sized so Cleartalk can support 70,000 voice users with average of 2,000 minutes of use per month with 2 years from the commercial launch following the acceptance test.

8 25

SCHEDULE 2

SHARE OF RESPONSIBILITIES



8

## SCHEDULE 3

## BILL OF MATERIALS AND LIST OF DELIVERABLES

# SHARE OF RESPONSIBILITY FOR:

# - CLEARTALK -

# CDMA1x / EV-DO Field DEPLOYMENT

| | |
|---|---|
| PREPARED BY | Robert Poorman |
| REVIEWED BY | Neil Kirchner, Stephen Banner |
| ZTE APPROVAL | Robert Poorman |
| CUSTOMER APPROVAL | Eric Steinmann |
| DISTRIBUTION LEVEL | Customer Confidential |
| DOCUMENT NAME / REVISION NUMBER | SOR / Rev 1.2 |
| DOCUMENT REFERENCE NUMBER | |
| DOCUMENT STATUS AND RECORD TYPE | ☐ Draft ☐ Approved ☒ Project Record ☐ Corporate Record ☐ Perpetual Record |



This document contains proprietary information of ZTE Corporation and is not to be disclosed or used except in accordance with applicable agreements. © 2008, ZTE Corporation. All rights reserved.

ZTE中兴 CLEARTALK SHARE OF RESPONSIBILITY_V1.2

## DOCUMENT CONTROL SHEET

The Project Manager is responsible for authorising all changes and/or additions to this document. All changes are to be recorded on the Approval and Revision Record (below). The responsibility for maintaining, controlling and distributing this document rests with the person so designated by the Project Manager

## PROPOSING CHANGES

Suggestion for improving this document should be forwarded to the Project Manager

## DOCUMENT REVISION

A document revision number is affixed to each document to identify the document status and to ensure consistency in document distribution. The document revision number are applied as follows and are to be incremented by one each time a revision is incorporated.

REVISION NUMBER

Draft (0.0, 0.1, 0.2, etc.) 0.Z
Approved (1.0, 1.1, 1.2, etc.) 1.X

## APPROVAL AND REVISION RECORD

| Date | Amendment Details | [illegible] | Approved By | Version |
|---|---|---|---|---|
| 14-Aug-06 | Plan Creation | Robert Poorman | | 0.1 |
| 16-Aug-06 | Plan update | Robert Poorman | | 0.2 |
| 23-Aug-06 | Updated to reflect switch/bom and BTS scope changes provided by Leslie Williams | Robert Poorman | | 0.3 |
| 31-Aug-06 | Up issued to 1.0 | Robert Poorman | | 1.0 |
| 07-Sep-06 | Clarification of import taxes, duties, and fees | Robert Poorman | | 1.1 |
| 21-Sep-06 | Revised to reflect ClearTalk as principle for BTS HW installation | Robert Poorman | | 1.2 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |



This document contains proprietary information of ZTE Corporation and is not to be disclosed or used except in accordance with applicable agreements. © 2005, ZTE Corporation. All rights reserved.

## 1 DIVISION OF RESPONSIBILITY

The following table identifies planning, preparation, and implementation tasks relevant to the delivery of ZTE CDMA 1x / EV-DO REV. A trial network to Cleartalk. The table further identifies responsibility for each task. Responsibility is designated by an "X" in the appropriate column, either Cleartalk or ZTE. In some instances an "X" appears in both the Cleartalk and ZTE columns. This indicates a joint responsibility. Lead responsibility for joint actions is designated by "(X)".

| TASK | CLEARTALK | ZTE |
|---|---|---|
| PREPARATION | | |
| Project management | (X) | X |
| Identify / agree high-level trial milestones (project start, site ready, test schedule, etc.) | X | X |
| Define project scope & objectives | (X) | X |
| Identify project inclusions & exclusions | (X) | X |
| Define resource requirements for the project | X | X |
| Define roles & responsibilities for project resources | X | X |
| Define error management & configuration management (including SW updates) procedures | X | X |
| Define reporting requirements | X | X |
| Provide list depicting contact information for key account / project personnel. (include phone, e-mail, and physical addresses. | X | X |
| Create / provide detailed equipment lists for equipment, materials, and services | | X |
| Create / provide switchroom floor plan and installation records | | X |
| Expedite delivery of outdoor BTS mounting brackets and T1 cabling | | X |
| Create master schedule for the project | X | |
| Create project plan document (for ZTE equipment implementation) | | X |
| Develop CDMA1x / EV-DO Rev A Acceptance Test Plan (ATP) | X | (X) |
| Approve ATP | (X) | X |
| Network Element Installation planning site surveys | X | (X) |
| Provide any necessary drawings, documents, and specifications which may be required by ZTE to plan installation, commissioning, and integration the BSC, OMC, and BTS network elements. | X | |
| Implementation planning | X | (X) |
| Network element equipment ordering (to manufacturing) | | X |
| Installation material ordering (to manufacturing) | | X |
| Facilitate the delivery of all site specific information necessary to create the network element details. | X | |
| RF Planning | X | (X) |
| Create network element details | X | (X) |
| Provide administrative space for ZTE engineers | X | |
| Logistics | | |
| Provide "ship to" information requested by ZTE | X | |
| Freight – from ZTE to customer warehouse | | X |
| Customs clearance (in USA) | | X |
| Payment of customs, duties, taxes, and fees up to the limits defined in the contract | X | |
| Provide warehouse for temporary storage of equipment | X | |
| Equipment transport (port to warehouse & warehouse to site) | X | |
| Provide Boom Truck for BTS Delivery | X | |
| Provide Cranes and/or special delivery assistance for rooftop or hard-to-access sites | X | |



This document contains proprietary information of ZTE Corporation and is not to be disclosed or used except in accordance with applicable agreements. © 2005, ZTE Corporation. All rights reserved.

8 48

ZTE中兴

## CLEARTALK SHARE OF RESPONSIBILITY_V1.2

| TASK | CLEARTALK | ZTE |
|---|---|---|
| Unpack and inventory equipment at site | X | |
| Remove packing debris and clean site prior to installation | X | |
| Initiate claims related to in-transit damages and/or equipment loss | | X |
| CORE IMPLEMENTATION | | |
| MTSO site preparation (provide floor space, transport, DC power, grounding, etc.) | X | |
| Provide and install overhead cable racks and floor supports | | X |
| Provide and install equipment room BDFB for ZTE Core equipment | X | |
| Provide and install DC power cable from BDFB to PDF | | X |
| Provide and install DC power cable from ZTE equipment cabinets to BDFB | | X |
| Provide and install separate ground bar for ZTE equipment | X | |
| Provide and install connection between ZTE ground bar and MGB | X | |
| Provide and install PE ground cable from MGB to ZTE Cabinets (≤ 5 Ω) | | X |
| Provide STP connectivity (as required) | X | |
| Provide necessary circuits for network element interfaces | X | |
| Provide [illegible] transport circuits (T1) for A-Bis connection | X | |
| Provide DSX panel(s) for circuit termination | X | |
| Provide & install GPS antenna, coax cable and mounting hardware for redundant BSC clock source | | X |
| Provide desk space for ZTE I/O terminal equipment (PCs) | X | |
| Provide uninterrupted AC for I/O terminal equipment | X | |
| Provide uninterrupted 220 VAC for server cabinets | X | |
| Provide IP addresses for ZTE network elements | X | |
| Prepare IP Planning for ZTE Network | | X |
| Provide and install all LAN cables to/from Network Elements & I/O terminals | | X |
| Provide required installation tools | | X |
| Provide required test equipment | | X |
| Equipment installation supervision | | X |
| Protect floors and walls prior to equipment ingress | | X |
| Equipment installation | | X |
| Equipment commissioning | | X |
| Equipment integration | X | (X) |
| PSTN integration & debug | X | (X) |
| PDSN integration & debug | X | (X) |
| Network element acceptance testing | X | (X) |
| Network element acceptance | (X) | X |
| BTS IMPLEMENTATION | | |
| BTS Site Preparation (floor space, pads, transport, AC and/or DC Power, circuit breakers, overhead racks, feeder and antenna systems, etc.) | X | |
| Permits & licenses | X | |
| BTS site access | X | |
| Provide BTS spare parts for testing purposes | | X |
| Provide ongoing BTS installation tools | X | |
| Provide BTS test equipment | | X |
| Install conduit (with pull string) for T1 cables between Telco Demarcation point and outdoor BTS | X | |
| Provide termination point for T1 cables for indoor BTS | X | |
| Install and terminate ZTE provided T1 cables from BTS to telco Demarcation point | X | |

ching and
operating purposes



This document contains proprietary information of ZTE Corporation and is not to be disclosed or used except in accordance with applicable agreements. © 2005, ZTE Corporation. All rights reserved.

8 88

ZTE中兴

# CLEARTALK SHARE OF RESPONSIBILITY_V1.2

| TASK | CLEARTALK | ZTE |
|---|---|---|
| Provide tested transport circuits (T1) for A-Bis connection (BSC to Telco Demarcation) | X | |
| Install ZTE provided GPS antenna and cable (to ZTE BTS) for clock source | X | |
| Provide and install 220 VAC power (entrance panel to BTS) as required to all outdoor BTS | X | |
| Terminate 220 VAC service at outdoor BTS | X | |
| Provide and install 110 VAC power (entrance panel to BTS) as required to all indoor BTS | X | |
| Terminate 110 VAC service at indoor BTS | X | |
| Provide 30 – 80 minute battery back-up for outdoor BTS sites | | X |
| Provide emergency generators for BTS sites (as required) | X | |
| Provide 2 hour battery back-up for indoor BTS sites (includes batteries and battery rack) | | |
| Provide ground point for BTS (< 5 Ω) – indoor and outdoor | X | |
| BTS model site installation training – Two sessions for each BTS application: • CBTS-O1 • CBTS-I3 • Micro BTS | | X |
| BTS installation supervision | X | (X) |
| BTS installation | X | |
| BTS commissioning & debug | | X |
| BTS antenna system preparation | X | |
| BTS A-Bis integration | X | (X) |
| BSC data fill changes in the incumbent BSC (BTS parameters) which may be required to support BTS outdoor sites | N/A | N/A |
| Identify frequencies to be used for each BTS | X | |
| Provide lightning arrestors and ground bar at bottom of coax runs | | X |
| Install ZTE provided BTS antenna jumpers for indoor BTS (ZTE BTS to cable entrance point) | X | |
| Install ZTE provided BTS antenna jumpers for outdoor BTS (ZTE BTS to ice bridge) | X | |
| BTS Cutover (BTS on-air) | X | (X) |
| BTS call testing | X | (X) |
| Network element acceptance testing | X | (X) |
| RF Optimization (cluster) | X | (X) |
| Antenna adjustments identified at cluster optimization (as required) | X | |
| Network element acceptance | (X) | X |
| RF Optimization (network) | X | (X) |
| Antenna adjustments identified at network optimization (as required) | X | |
| CDMA2000 1X / EV-DO Rev A Acceptance | | |
| Execute 1x Acceptance Test Plan | (X) | X |
| Provide technical support for the testing (as requested) | | X |
| Issue final acceptance report | X | |
| Network acceptance | (X) | X |

They should be supervising the install of their equip

*(X) indicates lead responsibility on joint activity*



*This document contains proprietary information of ZTE Corporation and is not to be disclosed or used except in accordance with applicable agreements. © 2005, ZTE Corporation. All rights reserved.*

8 48

# SCHEDULE 4

## SPECIFICATIONS

Specifications to be to
Tony Sabatino's reasonable
acceptance by 9-30-05

**SCHEDULE 5**

**PRICE LIST**

subscribers are being served and thereafter $75,800 per each increase of 20,000 subscribers switch capacity is limited to MSS and BSC only

PDSN, SMS, MMS, and OTA will be additional $70,000 per increase of 20,000 subscriber until 210,000 subscribers are biging served and thereafter $65,000 per each increase of 20,000 subscribers until 400,000 subscribers

8 45

## SCHEDULE 5

### Guaranteed Future Pricing capx LIST

Prices set forth in Schedule 5 may if in accordance with the market for competitive products be increased by up to 5% annually commencing January 1 of 2009.

| CDMA Mobile Communication BTS | Unit Price $ |
|---|---|
| S1 Outdoor 20 watt Micro) with two RF heads(220VAC) | 20,227 |
| S111 Indoor with three RF heads (220VAC) | 40,528 |
| S111 outdoor 40 watt (220VAC) | 32,000 |
| S111 outdoor 40 watt w/3 RF heads * (220VAC) | 46,000 |
| S111111 Indoor BTS macro (spec price) (220VDC) | 43,000 |
| S4 Outdoor 20 watt Micro - Budgetary | 28,000 |
| AWS BTS will be at 10% premium for QCT passing thur cost | |

**BTS Upgrade Cost**

[illegible] - All 220 VAC

| 40 W System ([illegible]) | CBTS indoor | Upgrade Delta | CBTS outdoor | Upgrade Delta | BTS B | Upgrade Delta | Max # of calls supported |
|---|---|---|---|---|---|---|---|
| S111 | 27,[illegible] | | 32,[illegible] | | 4[illegible] | | [illegible] |
| S222 (same RRH Upgrade) | 32,[illegible] | 4,[illegible] | [illegible] | 4,[illegible] | [illegible] | [illegible] | 2772 |
| S333 | 37,[illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| S444 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| S555 | NA | | NA | | [illegible] | [illegible] | [illegible] |
| S666 | NA | | NA | | [illegible] | [illegible] | [illegible] |
| S111111 w/ RFS in CBTS | 40,528 | | [illegible] | | [illegible] | | |
| S222222 w/ RFS in CBTS | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | |
| S333333 | NA | | NA | | [illegible] | [illegible] | |

| 20 W System ([illegible]) | CBTS indoor | Upgrade Delta | CBTS outdoor | Upgrade Delta | BTS B | Upgrade Delta | Max # of calls supported |
|---|---|---|---|---|---|---|---|
| S111 | [illegible] | | [illegible] | | [illegible] | | [illegible] |
| S222 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| S333 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| S444 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| S555 | NA | | NA | | [illegible] | [illegible] | [illegible] |
| S666 | NA | | NA | | [illegible] | [illegible] | [illegible] |
| S111111 w/ RFS | [illegible] | | [illegible] | | [illegible] | | |
| S222222 w/ RFS | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | |
| S333333 | NA | | NA | | [illegible] | [illegible] | |

**Switch and Service Element Growth Price Schedule**

The cost to Grow the non Base station elements of the ordered equipment to handle additional subscribers beyond 70,000 for this market or other markets that this switch will be used for will be $84,200 per each increase of 20,000 subscribers until 210,000

8 48

[illegible]

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total Price | | | | | [illegible] | | | | | |

Capacities [illegible]

[illegible]

[illegible]

All components will be CDMA 1X [illegible] EVDO

Customer will be able to choose [illegible] T-1 for backhaul

Growth [illegible]

Software [illegible]

Services [illegible]

* [illegible]

** [illegible]

*** [illegible]

Penalty [illegible]

Payment [illegible]

Accepted

8 48

Initial Order

[illegible]

Capacities [illegible]

Growth [illegible]

Software [illegible]

Services [illegible]

Penalty [illegible]

Payment [illegible]

This option can be considered for future project.

Jack

The best way to drive a market for your products is to have them tied to applications. We have the core of a successful application business in place and plans to expand that. We currently do our own billing, inventory control and point of sale. Our first task will be to make these industry grade and proven in our new large markets. Our next task will be to integrate new features such as roaming and the related billing into our software. We will also expand our focus to include parental and school control features, broadcast SMS and possibly location based services in the next year. This represents a very large market that the other flat rate carriers pay up to $1.60 per subscriber per month over a very large and growing subscriber base. We would like to invite ZTE, its programmers and its fledging venture capital fund to be a part of this effort. You can agree by writing back and confirming that you will accept one of the following options to do this:

1) You will give the Software venture a preferential programming rate and on payment of $1,240,000 you will provide up to 20,000 hours of programming to this venture and deliver all source code and ownership to this venture. Additionally you will be given and ownership interest of 5% in the Software venture.

2) In the event you wish to increase your stake in the venture you can do so by contributing cash in the amount of $60,000 for every additional 1% of ownership up to 15%

In either case you will reduce the cost for our initial order of equipment and upon payment of the fees due your company and receipt of stock certificates evidencing your investment in this software company, Schedule 2 in the amount of $2,360,000 will be the applicable Schedule determining price for the equipment initially purchased for the Jacksonville market.

Eric Steinmann
1255 Rivera Drive (Box 1976)
Wrightwood, Ca. 92397
760-249-4949
760-646-0990 (mobile)
760-249-6353 (fax)

This option can be consided for future project. . 

dd

## SCHEDULE 6

## TRAINING SCHEDULE

# SCHEDULE 6

## TRAINING SCHEDULE

ZTE will provide all training free of charge for ClearTalk's network engineers in Jacksonville as is necessary to fully operate, optimize and maintain the network, while also providing two sets of all documentation and operator manuals. All such training will be on-the-job training during installation, commissioning and optimization of the network.

Instructor-led training classes will be made available at extra cost to ClearTalk, either at ZTE University or on site in Jacksonville at a mutually-agreed location. Pricing proposals of such classes will be made on a basis that customer pays for air, local transportation and hotel if held in China or at any ZTE location, or pay for ZTE instructors' air, local transportation and hotel at ClearTalk location. An outline of available instructor-led classes is found in the following table, in which Level A classes are designed for personnel who will be involved in system troubleshooting and other areas that require an expert level understanding of the system, and Level B classes are designed for personnel who will work more at the daily operations level.

| Subject Area | Level A (days) | Level B (days) |
|---|---|---|
| ZXC10-HLR/AUC | 10 | 5 |
| ZXC10-3GCN MSCe and MGW | 20 | 10 |
| ZXC10-BSSB | 15 | 8 |
| ZXCOMC | 15 | - |
| Totals | 60 | 31 |

8 45

# SCHEDULE 7

## ACCEPTANCE TEST PROCEDURE

PROCEDURE TO INCLUDE THOSE
FOLLOW UP ITEMS FROM THE
ATTACHED EMAIL AS WELL
AS THE CDMA 2000 1X TEST
PROPOSAL 66 PAGE DOCUMENT
TO BE PRINTED AND ATTACHED
BY ZTE. AND ZTE'S 121 PAGE
3GEN TEST PLAN.



SS

**From:** Tony Sabatino [tony.sabatino@yahoo.com]
**Sent:** Thursday, September 21, 2006 8:57 AM
**To:** Stephen Banner; tony.sabatino@yahoo.com
**Cc:** Robert.Foorman@zteusa.com; nsk@zteusa.com; 'Jack Yang'
**Subject:** Re: ZTE ATP Documents

Okay it has taken me some time to go through these.

I am good with all this.

*Stephen Banner <sbanner@zteusa.com>* wrote:

Hi Tony,

Please find attached the ATP documents we discussed a couple of weeks ago, modified to reflect many of the changes we discussed.

However there are a few outstanding items, as follows:

1. CDMA2000 1x Test Document

a. I'm trying to get details on the load tester to see how we use it to simulate a load on the network.

b. I'm working with our testers to see the best place to insert long distance mobile <--> land test calls into this document.

c. Feature testing with star codes is already covered to some extent in the 3GCN document, so I suggest that we put a place-holder in that document to ensure that when we receive ClearTalk's full list of star feature codes we will add them to the test plan.

d. Zone-based registration is tested in section 2.12.5 of the 3GCN document.

e. I'm trying to get an explanation of the "fair share algorithm" for 1x data, to see how we can add it to the list of tests.

f. I believe we support "silent retry", but I'm trying to confirm that and get it added to the tests.

g. We show WLNP, CALEA and E911 in the network diagram but we need to add these tests to the document.

2. 3GCN Test Document

This document seems to be in good shape, notwithstanding the changes that still need to be made based on the above.

[x]

Steve Banner
ZTE USA, Inc.
Director System Engineering

2425 N Central Expy

## SCHEDULE 8

## VENDOR FINANCING AGREEMENT

$100,000 must be paid to ZTE upon issuance of the Customer Purchase Order for the entire initial project thereafter payments will be as set forth in Schedule 3 an further herein;

The remaining Ninety (90%) will be financed for a period of Three (3) years at an interest rate of LIBOR (LIBOR rate at the beginning of the year will apply for the full year). Default rates and charges shall be as described in Paragraph 5 Payment Terms of the Master Supply Agreement. The accrual of interest on the indebtedness shall commence on and from the date (the "Commencement Date"), either the successful completion of testing pursuant to Schedule 7 "Acceptance Test Procedure", or when fully functional commercial use of the Products is made by Customer whichever is earlier, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE, if the network is at that time in commercial use and is reasonably functioning in the manner intended. Signing this agreement will constitute an initial purchase order in accordance with Schedules 3 and 4.

The indebtedness of Customer shall be evidenced by a negotiable Promissory Note. Repayment shall be in twelve (12) equal quarterly installments over the term of the loan commencing with the quarter following the Commencement Date.

ZTE will retain a purchase money security interest in all equipment and other products sold to Customer until such time that the then outstanding total indebtedness of Customer to ZTE is is repaid. On request ZTE will release parts of the equipment purchased from the security interest to reflect payments to date on this indebtedness.

At the time stated in Exhibit 3, Customer or its guarantors agrees to deposit with ZTE the sum of $2,000,000 USD which serves as a Guaranty of Payment securing all sums due and owing to ZTE by the Customer under the Vendor Financing Agreement. It is understood that the further performance of ZTE's obligations under the Master Supply Agreement are conditioned upon receipt of this sum.. The $2,000,000 USD is agreed to be converted to RMB at the spot rate of the transaction date and accrue interest at the ~~Bank of China's rate of (2.8%)~~ for the following 3 years, or for the period remaining that it is required as collateral herein, if less. therafter retirement of this credit facility will be in USD at the then spot rate on the retirement date. ZTE guarantees to return this facility in full in accordance with the provisions hereof if Customer has fulfilled its repayment obligations to ZTE in accordance with this Vendor Financing Agreement. This $2,000,000 should delivered within 1 week of the 50th BTS received.

THIS RATE WILL BE THE SPOT RATE AT THE TIME OF THE $2,000,000 DEPOSIT AND WILL BE ADJUSTED ANNUALLY THEREAFTER. 23 EJS

8 48

Following execution of the Master Supply Agreement, the parties shall promptly negotiate and enter into a mutually acceptable definitive customary financing agreement along with ancillary documents which incorporate and implement the foregoing provisions.



8 45

# CLEARTALK AC / DC POWER REQUIREMENTS

VERSION 1.2

| | | | | | | |
|---|---|---|---|---|---|---|
| BSC | 48VDC | 2 | N/A | 30 AMPS | 50 AMPS | 1560 W |
| MSC | 48VDC | 2 | N/A | 15 AMPS | 20 AMPS | 700 W |
| MGW | 48VDC | 2 | N/A | 80 AMPS | 100 AMPS | 2500 W |
| HLR | 48VDC | 2 | N/A | 16 AMPS | 20 AMPS | 700 W |
| SMS | 48VDC | 2 | N/A | 18 AMPS | 20 AMPS | 800 W |
| PDSN | 48VDC | 2 | N/A | 25 AMPS | 40 AMPS | 1200 W |
| OTA | 48 VDC | 2 | N/A | 13 AMPS | 20 AMPS | 600 W |
| MMS | 48 VDC | 2 | N/A | 13 AMPS | 20 AMPS | 600 W |
| 3G CN SERVER # 1 (HLR) | 110VAC | 2 | 20 AMPS | N/A | 30 AMPS | 2250 W |
| 3G CN SERVER # 2 (MGW) | 110VAC | 2 | 20 AMPS | N/A | 30 AMPS | 2250 W |
| BSC / PDSN SERVER | 110VAC | 2 | 10 AMPS | N/A | 20 AMPS | 1200 W |
| SMS SERVER | 110VAC | 2 | 45 AMPS | N/A | 60 AMPS | 5000 W |
| OTA SERVER | 110 VAC | 2 | 60 AMPS | N/A | 75 AMPS | 6600 W |
| MMS SERVER | 110 VAC | 2 | 60 AMPS | N/A | 75 AMPS | 6600 W |

2 53

CLEARTAL... dTSO FLOOR PLAN



ZTE中兴



# SCHEDULE 10

## Tennessee Market Budgetary Price

| [illegible] | | | |
|---|---|---|---|
| Main Equipment | | | |
| CDMA Mobile Communication BSC | 1 | 113,088 | $ 113,087.89 |
| | | | |
| | | | |
| CDMA Mobile Communication BTS | | | |
| S111 Micro (Outdoor, 20 watt) | 5 | 25,879 | $ 129,395.00 |
| S111 CBTS (outdoor, 40 watt) | 40 | 32,162 | $ 1,286,488.00 |
| S111111 (Indoor BTS macro, 40 watt) | 5 | 50,027 | $ 250,134.88 |
| | | | |
| Total sites | 50 | | |
| | | | |
| CDMA Mobile Communication MSS | 1 | 347,996 | $ 347,996.00 |
| MSCe | 1 | | |
| MGW | 1 | | |
| HLR | 1 | | |
| PDSN | 1 | 106,000 | $ 106,000.00 |
| OTA | 1 | 120,000 | $ 120,000.00 |
| MMSC | 1 | 234,000 | $ 234,000.00 |
| | | | |
| | | | |
| CDMA OMM System | 1 | 12,093 | $ 12,093.00 |
| Sub-total Price | | | |
| | | | |
| Service Platforms | | | |
| SMSC | 1 | 70,000 | $ 70,000.00 |
| Sub-total EQUIPMENT Price ONLY | | | |
| With HLR and MSS | | | $ 2,568,185.80 |
| Without HLR and MSS | | | $ 2,454,185.80 |



8 65